**HAWLEY FUEL COALMART, INC.,**
**and Hawley Fuel Coal, Inc.,**
**Plaintiffs-Appellants,**

v.

**STEAG HANDEL GMBH,**
**Defendant-Appellee.**

**No. 689, Docket 85–7787.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 27, 1986.

Decided July 15, 1986.

---

George Berger, New York City, (Debra A. Roth, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for plaintiffs-appellants.

Herbert Rubin, New York City (Edward L. Birnbaum, Terry Myers, Barbara D.

Goldberg, Herzfeld & Rubin, P.C., New York City, of counsel), for defendant-appellee.

Before FRIENDLY *, OAKES, and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This diversity case involves the question whether a combination of writings satisfied the New York statute of frauds. The United States District Court for the Southern District of New York, John E. Sprizzo, Judge, held that it did not and therefore set aside a jury verdict of $1,481,249.34 plus interest in favor of appellants Hawley Fuel Coalmart, Inc., and Hawley Fuel Coal, Inc. (jointly "Hawley"), in their suit against appellee, Steag Handel GmbH ("Steag"), for breach of a contract of guarantee. 614 F.Supp. 361 (S.D.N.Y.1985). We reverse and direct entry of judgment on the verdict.

Hawley, a supplier of coal to Alla-Ohio Valley Coals, Inc. ("Alla"), had terminated that relationship because of Alla's late payments. Subsequently, Steag and Alla entered into agreements under which Steag undertook to finance coal purchases by Alla through the medium of documentary letters of credit drawn on Steag's New York City bank, Commerzbank. The letters of credit were to be drawn in Alla's favor and Alla was then to transfer the letters to coal suppliers. After Steag and Alla established this relationship, an arrangement was worked out in June, 1981, under which Hawley would again sell coal to Alla. Steag was to advise Alla of its requirements, Alla in turn would issue a purchase order to Hawley to meet them, Steag would approve the order and direct Commerzbank to issue a documentary letter of credit, which Alla would then transfer to Hawley. Hawley would subsequently deliver coal in accordance with the purchase orders and present its delivery documents to Commerzbank for payment.

---

* Judge Friendly's death occurred after argument but before this opinion was written; he voted in favor of the disposition made herein.

Commerzbank would pay Hawley and charge Steag's letter of credit account. This arrangement apparently functioned only until August of 1981 when Hawley began to build up an accounts receivable backlog because of delays in obtaining letters of credit and amendments to those letters. By early October, 1981, Hawley was owed approximately $2.2 million for coal delivered to Alla under the agreement.

In mid-October of 1981 the parties met at the Carlyle Hotel in New York City at Hawley's request. Hawley was represented by its president, Jean-Paul Ruff, and vice president/treasurer, Martin Farber. Steag was represented by Thomas Mulert and Jens Klien, two of its managing directors. The accounts presented at trial varied as to what happened at that meeting. The jury, however, apparently credited Hawley's version, as follows. Hawley indicated that, unless it received immediate payment of the $2.2 million owed either for coal that had been shipped or that was in the process of being shipped under open purchase orders, it would stop all further shipments and direct counsel to attempt to reclaim coal in transit or at the ports awaiting loading. Mulert in response said that he was going to Washington on October 15 and asked that a breakdown of the $2.2 million be sent to Max Bonner, who was scheduled to become Alla's president, in Washington; Hawley agreed to send this information. Mulert then stated that Steag would make a $500,000 cash down payment to Hawley on the amounts due and owing under the letters of credit and that Steag would guarantee payment of the balance of the coal shipped or to be shipped under existing purchase orders by means of a new letter of credit. Ruff and Farber agreed that Hawley would take no further steps to reclaim the coal and asked that Steag's agreement be confirmed in writing. Mulert agreed to provide this confirmation when he reached Washington.

On October 15, 1981, Farber telexed Bonner the requested breakdown. The telex listed invoices submitted to Commerzbank that had not been paid because promised letters of credit had not been issued, outstanding invoices sent directly to Alla, and invoices that were to be submitted to Commerzbank after letters of credit had been issued. That same day Mulert, on behalf of Steag, telexed Hawley, attention Mr. Ruff, as follows:

URGENT URGENT URGENT

THIS IS TO CONFIRM ON BEHALF OF STEAG HANDEL GMBH, THAT WE SHALL PAY TO YOU OUT OF OUR BANK ACCOUNT AT COMMERZBANK IN NEW YORK A DOWNPAYMENT FOR COAL SHIPPED BY YOU TO ALLA-OHIO IN THE AMOUNT OF US DOLLARS, 500,000. THE PAYMENT SHALL BE EFFECTED BY TELEGRAPHIC TRANSFER ON OCTOBER 16, 1981.

THE BALANCE OF THE AMOUNTS OWED TO YOU BY AOV SHALL BE PAID UNDER LETTERS OF CREDIT OPENED AT COMMERZBANK NEW YORK. STEAG WILL OPEN THESE LETTERS OF CREDIT IN THE COURSE OF THE NEXT WEEK.

Mulert testified at trial that he thought the agreement reached at the Carlyle Hotel covered only coal already delivered. He maintained that a total of about $584,000 was owed for this coal and that the balance referred to in the third paragraph of his telex was thus approximately $84,000. The jury, answering a special interrogatory, found that this was not Steag's agreement at all. In rejecting Mulert's testimony, the jury found specifically that Steag agreed to guarantee the payment of all sums owed by Alla to Hawley with respect to all coal delivered and to be delivered under open purchase orders between Alla and Hawley, namely, the $2.2 million referred to in the Hawley telex of October 15.

The Steag telex of October 15 secured its desired end. Upon receipt of that telex, Hawley instructed counsel to cease all efforts to reclaim coal and resumed its deliveries, shipping another $168,000 worth of coal to Alla thereafter.

On October 16, Hawley received a telex sent by Steag and its new business associ-

ate, H.C. Sleigh Limited ("Sleigh"), which reads as follows:

> WE HAVE BEEN ADVISED BY AOV INDUSTRIES, INC. THAT YOU ARE OWED MONEYS FOR COAL SUPPLIED TO AOV.
>
> THIS IS TO CONFIRM TO YOU THAT H.C. SLEIGH LIMITED HAS ACQUIRED A 50 0/0 SHARE IN AOV'S STOCK. IN THIS CAPACITY SLEIGH IS IN THE MIDST OF STRENGTHENING AOV'S FINANCIAL CAPACITY WITH THE HELP OF STEAG HANDEL GMBH OF GERMANY, AOV'S PRINCIPAL DISTRIBUTOR.
>
> THIS STRENGTHENING IS EXPECTED TO RESULT IN A TRANSFER OF FUNDS TO YOUR ACCOUNT IN FULL PAYMENT OF THE INDEBTEDNESS PRESENTLY OWED TO YOU. H.C. SLEIGH AND STEAG LOOK FORWARD TO REESTABLISHING A SOUND AND MUTUALLY SATISFYING BUSINESS RELATIONSHIP WITH YOU IN THE IMMEDIATE FUTURE.

This telex was sent to all of Alla's creditors. The first sentence of the third paragraph seemed to Hawley officials to send signals in conflict with the telex of October 15, which stated that Hawley "shall" be paid for amounts owed by Alla. They called Bonner for clarification and later received in response a telex from him:

> FURTHER TO OUR TELEPHONE CONVERSATION AND TO CLARIFY OUR GENERAL MASS DISTRIBUTION TELEX SENT 15 OCTOBER TO ALL CREDITORS OVER THE JOINT SIGNATURES OF SLEIGH AND STEAG,
>
>> PLEASE BE REASSURED THAT IT WAS AND IS THE INTENTION OF SLEIGH AND STEAG TO GUARANTEE FULL PAYMENT OF THE INDEBTEDNESS TO YOU OF MONEYS OWED BY AOV.
>
> PLEASE ALSO REFER TO STEAG'S OTHER TELEX OF 15 OCTOBER ADVISING THAT A DOWN PAYMENT OF

USD 500,000 WOULD BE MADE AND THAT, I QUOTE

>> "THE BALANCE OF THE AMOUNTS OWED TO YOU BY AOV SHALL BE PAID."

Hawley responded as follows:

> WE APPRECIATE THE RECEIPT OF YOUR TELEX 0892413 CLARIFYING THE INTENTION OF SLEIGH AND STEAG TO GUARANTEE FULL PAYMENT OF INDEBTEDNESS OWED US BY AOV.

On October 16 Mulert telexed Commerzbank directing the payment of $500,000 to Hawley. Significantly, under the heading "DETAILS OF PAYMENT," he stated that this money was a "DOWNPAYMENT FOR OUTSTANDING INVOICES OF AOV." Hawley received the $500,000 on October 19 and credited it against the amount outstanding and due from Alla. On that same day a Steag employee in Washington telexed Steag's home office advising of the

> US DOLLARS 500,000.00 ... DOWN PAYMENT FOR DELIVERIES OF THE JOINT BUSINESS (MAINLY CORAL). COMMERZBANK NEW YORK IS IN THE POSSESSION OF DOCUMENTS FOR MORE THAN US DOLLARS 500,-000.00 WE AGREED WITH COMMERZBANK ... THAT THIS DOWN PAYMENT WILL BE TAKEN INTO ACCOUNT WHEN MAKING THE PAYMENTS FOR THE ALREADY OPENED L/C'S.
>
> HAWLEY HAD STOPPED FURTHER DELIVERIES BECAUSE THERE WERE 52 OPEN INVOICES WITH AN AMOUNT OF 1,6 MIO [sic, MIL] US DOLLARS.

Steag then telexed Hawley on October 20:

> TO HAWLEY FUEL
>
> RE.: DELIVERY TO ALLA OHIO
>
> WE HEREWITH WANT TO INFORM YOU THAT WE HAVE OPENED LETTER OF CREDITS [sic] IN YOUR FAVOUR IN THE AMOUNT OF USD 633,-000.00 PROBABLY TOMORROW THE RELEASE WILL BE GIVEN TO THE BANK FOR EDITIONAL [sic] USD 1,385,000.00.

Hawley did not receive the $633,000 letter of credit referred to in the October 20 telex. While Steag later opened three letters of credit in the promised amount of $1,385,000, these were not designated for the balance due on open purchase orders. They were earmarked instead for specific purchase orders under which coal had never been shipped; thus Hawley could not collect under these letters of credit for coal already shipped pursuant to different purchase orders. Except for a partial payment under the third letter of credit and two further payments against old letters of credit, Hawley received no further payments under the agreement in suit.

On November 6, 1981, Alla filed a petition for reorganization in the United States Bankruptcy Court in the District of Columbia. Hawley in turn filed a claim in that proceeding for sums due.

## DISCUSSION

■ Hawley takes the position that the agreement at issue was not "technically" a guarantee of Alla's debt, but simply a modification of the payment terms of Steag's original undertaking; Hawley maintains that, as a modification of an original undertaking, the agreement was not within the statute of frauds. Under this theory, Steag's obligation to Hawley dated from June, 1981, when Steag agreed to pay Hawley for purchase orders by Alla through the issuance of documentary letters of credit. This agreement was revised when the letter of credit mechanism broke down. The modified agreement required Steag to make a $500,000 cash payment against moneys owed on stymied letters of credit and new letters of credit to issue covering the balance owed and to be owed for future coal deliveries under existing purchase orders. Hawley maintains that this was not a "special promise to answer for the debt ... of another person" within section 5–701(a)(2) of the New York General Obligations Law (McKinney Supp.1986), since it was an original promise serving a personal interest of Steag, and paying the debt of Alla was only an incidental effect. But as

the New York Court of Appeals has held, "[P]resumptively the new promise [by the third party] is unenforceable [under the statute of frauds] unless the corporation was discharged from its underlying obligation." *Martin Roofing, Inc. v. Goldstein,* 60 N.Y.2d 262, 267, 457 N.E.2d 700, 703, 469 N.Y.S.2d 595, 598 (1983), *cert. denied,* 466 U.S. 905, 104 S.Ct. 1681, 80 L.Ed.2d 156 (1984). There is nothing to suggest such a discharge of Alla. To the contrary, Hawley's filing of a claim in Alla's bankruptcy proceedings indicates that Alla was not discharged. In the absence of any evidence of discharge, Hawley's contract modification argument must fail.

Hawley argues in the alternative that even if the writings represent a promise of guarantee, and thus are covered by the statute of frauds, they are nonetheless sufficient to satisfy the statute's requirements. We find this contention convincing. Under New York law the writing necessary to satisfy the statute of frauds may be embodied in several documents, only one of which need be signed by the party to be charged. *See, e.g., Crabtree v. Elizabeth Arden Sales Corp.,* 305 N.Y. 48, 55–56, 110 N.E.2d 551, 554 (1953). In addition, the statute also requires that "all the material terms of the agreement" be contained either "expressly or by reasonable implication" in the writing. *Morris Cohon & Co. v. Russell,* 23 N.Y.2d 569, 575, 245 N.E.2d 712, 715, 297 N.Y.S.2d 947, 953 (1969).

■ In concluding that the writings were insufficient to satisfy the statute, the district court focused on the October 16 joint telex from Steag and Sleigh. Rather, it should have looked to the "URGENT URGENT URGENT" telex from Steag to Hawley on October 15, in combination with the October 19 Steag telex from Washington to its home office and the Steag telex of October 20 informing Hawley that letters of credit worth $633,000 had been opened in its favor and that "probably tomorrow" the release would be given to the bank for an additional $1,385,000. When considered with the October 15 telex of

Hawley to Bonner setting forth the balances due, the writings satisfy the statute.

The district court distinguished *Crabtree* on the basis that the court in this case could not ascertain essential terms and conditions of the contract sued upon without taking oral testimony. 614 F.Supp. at 364–65. The court below found that, while plaintiff established at trial the existence of an oral contract of guarantee, "the documents signed and/or prepared by the defendant manifest at best an agreement by the defendant to set up new letters of credit." *Id.* at 365. Judge Sprizzo noted:

> An agreement to open new letters of credit, even unconditional letters of credit, is not the same as a contract of guarantee, even though the letters of credit, once established, permit plaintiff to secure payment without meeting any of the technical requirements normally set forth in conditional letters of credit.

*Id.* at 366. Thus, the jury verdict in plaintiffs' favor was overturned because the court determined that plaintiffs had offered written evidence sufficient to support an agreement to open unconditional letters of credit, but insufficient writings to support the alleged contract of guarantee.

We disagree. The letters of credit here referred to were not conditional on future performance by Hawley. Steag's October 19 inter-office telex evidences the absence of such conditions when, with regard to the letters of credit, it simply states that "the money has been or will be collected by Steag." In other words, the letters of credit were what Professor Hawkland calls a standby or guaranty letter of credit, as distinguished from the conditional letter of credit on which the beneficiary can recover only by delivering a document of title to the issuer. *See* 6 W. Hawkland & T. Holland, *Uniform Commercial Code Series* § 5–102:06 (1984); *see also* Dolan, *Standby Letters of Credit and Fraud (Is the Standby Only Another Invention of the Goldsmiths in Lombard Street?)*, 7 Cardozo L.Rev. 1, 2–5 (1985). Since, as Professor Hawkland says, "the practical purpose of a standby letter of credit is to guarantee the obligation of the issuer's customer," 6 W. Hawkland & T. Holland, *supra*, § 5–102:06 at 19, the reference in the October 15 Steag telex to Hawley to letters of credit simply concerned the form in which part of the payment would be made.

The record provides ample additional documentary evidence demonstrating that the letters of credit were simply a form of payment. Steag's own telex of October 16 to Commerzbank refers to "outstanding" invoices of Alla and its telex of October 19 refers to "52 open invoices with an amount of 1,6 Mio [*sic*] US Dollars." Steag's confirmatory telex to Hawley referring to the opening of letters of credit worth $633,000 and an additional release "probably tomorrow" of $1,385,000 certainly speaks toward past amounts due. Thus, Steag had agreed to pay Hawley and the letters of credit were to be the form of payment, not a limitation or condition on the agreement. To the extent that it could be argued that these letters embodied conditions on the quality of the coal shipped, these conditions could only have gone to the amount, not the necessity of payment. In any event, Steag does not claim any offset for deficient quality nor did it reject any coal on that basis, and any argument concerning unsatisfied conditions is therefore clearly unavailing.

In short, the documentary evidence here clearly demonstrated that Steag agreed to issue letters of credit in the nature of guarantees and that it breached that agreement. While the complaint alleged a written guarantee of payment, it would be unduly technical to make the pleading outcome-determinative. The important fact is that the jury found that Steag made a guarantee and that there was clearly sufficient written evidence for that finding.

Judgment reversed.