**Richard M. ROSENTHAL, Plaintiff,**

v.

**Philip KINGSLEY, Defendant.**

**No. 85 Civ. 0945 (PKL).**

United States District Court,
S.D. New York.

Dec. 11, 1987.

necessary for federal removal purposes for plaintiff to state that Charles K. Wilkerson was a citizen of Texas.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Marc Libarle and Leroy Lounibos, Cotati, Cal., for plaintiff.

Frankfurt, Garbus Klein & Selz, P.C., New York City (Richard Kurnit and Maura Wogan, of counsel), for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

In this case, plaintiff Richard Rosenthal, an attorney, seeks to enforce the terms of an alleged contract for legal services. Plaintiff claims that from 1976 to 1981, he acted as lawyer and business consultant to defendant Philip Kingsley, a British citizen, in connection with the establishment of defendant's hair care business in the United States. Plaintiff alleges that either orally or in writing, defendant "agreed to compensate Plaintiff for said services at a rate not to exceed 25% of Defendant's gross professional income, whenever said income is received from projects of Defendant initiated during the period of time Plaintiff acted in said capacity." Complaint at 2, 3. Plaintiff further claims that defendant fraudulently misrepresented to plaintiff that such compensation would be provided for plaintiff's services. Plaintiff also seeks an accounting to determine the amount of relevant income earned by defendant, and seeks a declaratory judgment that he is entitled to receive the payments demanded in the complaint.

Defendant Kingsley has moved, pursuant to Fed.Rule Civ.P. 56, for summary judgment dismissing all counts of the complaint.

## STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court then must determine whether there does indeed exist a genuine issue as to any material fact; "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, 106 S.Ct. at 2511.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, Rule 56 does not require that the moving party support its motion with affidavits or other similar materials which negate the opponents claim. Rather, "the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* The burden on the moving party will be "discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Id.* 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson, supra,* 106 S.Ct. at 2511. Because the District Court must determine "whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," *id.*—the nonmoving party must produce, at the summary judgment stage, "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* While the Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975) (citations omitted), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted).

Ultimately, "[i]n considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied,* —— U.S. 762, 107 S.Ct. 1570, 94 L.Ed.2d —— (1987); *see also Eastway Contruction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985).

## FACTUAL BACKGROUND

The pleadings, depositions, affidavits, and other materials filed by the parties, construed in a light most favorable to the plaintiff, establish the following relevant facts:

Plaintiff Richard M. Rosenthal is an attorney who resides in New York. Defendant Philip Kingsley is a British citizen who also currently resides in New York. Since 1960, defendant has been a professional "trichologist"—that is, one who specializes in the analysis and treatment of hair and the scalp. Plaintiff met defendant for the first time in the late summer of 1975, when they were introduced by Joan Maizner (presently defendant's wife), who had been formerly employed by plaintiff as a legal secretary.

During that initial meeting, plaintiff expressed an interest in defendant's trichology business; in the following year, plaintiff and defendant continued to discuss, primarily through written and telephone correspondence, the possible expansion of defendant's business into the United States market. While defendant remained in England, plaintiff researched several aspects of the New York beauty industry, and spoke with several people familiar with that industry.

In August 1976, plaintiff and defendant spent a weekend together at plaintiff's house in Long Island. During that weekend, the parties continued their discussions about the possibility of opening a trichological center in New York. In discussing plaintiff's role as a lawyer and consultant, defendant said he had learned from Ms. Maizner that plaintiff usually receives ten percent of the gross income of clients for whom such services are provided. During that weekend, defendant stated orally that plaintiff would receive ten percent of defendant's gross United States income, along with a fee to be worked out at a later date and a small ownership interest in the trichological center that defendant hoped to open in the United States.

On December 8, 1976, plaintiff sent a letter (Letter 1) to defendant, in which plaintiff discussed some of the ideas emanating from the Long Island meeting, and in which plaintiff proposed that he own five percent of the corporate shares of the anticipated trichological center. This letter included no discussion of plaintiff's interest in defendant's income. On January 31, 1977, defendant responded in a letter (Letter 2), in which defendant stated that plaintiff should receive only three percent of the shares in the new center. Ultimately, the parties agreed that plaintiff would own four and one-half percent of the stock in the new center, and plaintiff currently holds a stock certificate representing that ownership interest.

On September 15, 1977, defendant sent a letter (Letter 3) to plaintiff in which he discussed several personal and business matters. In a handwritten postscript, defendant stated that a woman named Lesley[1], mentioned in the letter, "has too many points of the equity anyway. You [plaintiff] have been doing a lot of the administration which has been beyond her & [sic] I think that you should have more of hers (irrespective of the agreement you & I will make)."

In October 1977, the new Kingsley Trichological Centre opened in New York City. At first, business was slow. Plaintiff arranged with a literary agent to have published a book about defendant's hair and scalp treatments. Defendant received a $10,000 advance from the publisher, of which defendant kept $4500, and plaintiff received ten percent, or $1000. The remaining $4500 was paid to Dotsun Rader, a client of plaintiff who had written an article about defendant and the hair center in *New York Magazine*, and who had played a role in the publication of the book. Plaintiff paid $500, out of his $1000, to the literary agent with whom he had been working. The book, a tour by defendant to promote the book, and the publication of the *New York Magazine* article, apparently

---

**1.** In his deposition, plaintiff identified this woman more specifically as "Leslie Rolette," whom plaintiff said "was to be manager of the premises [the new trichological center in New York] until she and Mr. Kingsley had a falling out." Rosenthal Deposition, April 29, 1985, at p. 33.

substantially increased the number of customers who patronized the New York trichological center. Plaintiff claims that despite this success, however, by the end of 1977, the only payment he received from defendant or defendant's business, other than the royalties and the stock, was a cash disbursement of $3000.

In 1978, defendant's trichological center continued to increase its client base, although the record does not make clear the extent to which that business actually was profitable. Plaintiff continued to serve as attorney and business consultant to defendant and his business. In 1978, plaintiff's total fees related to defendant were $7600 from the Trichological Center, with no money actually being paid by defendant himself.

On July 1, 1978, defendant and Ms. Maizner moved into plaintiff's New York apartment, where defendant then lived for approximately two and one-half years. At this time, plaintiff and his family moved to California.

During the end of 1978 and 1979, plaintiff and defendant began to discuss the possibility of entering into a business relationship with some manufacturer or distributor of hair or beauty products. At that time, the parties were most interested in securing a business partner that could market defendant's hair treatment products. Plaintiff and defendant, both separately and together, had several meetings during this period with executives of at least one beauty product company.

On or about August 30, 1979, defendant met in London with his accountants. Based on that meeting, one of those present, Timothy Elwes, of Timothy Elwes & Partners, wrote a memorandum (Letter 4) which was distributed to those present, and a copy of which was sent to plaintiff by defendant. In discussing the relationship between the shareholders of the Trichological Centre in New York, the memorandum stated that "[t]he situation is further confused by the fact that RR [Richard Rosenthal] in his personal capacity is said to own 10% of PK [Philip Kingsley] and thus of all PK's activities including the sale of products (and processes) invented and marketed by PK."

Soon after, in mid-October 1979, plaintiff and defendant met in Palm Springs as the guests of Clairol, a subsidiary of Bristol–Meyers. While at Palm Springs, plaintiff and defendant discussed further the allocation of profits from any business deal involving the sale of defendant's hair care products, and discussed a possible product deal involving Bristol–Meyers.

Several weeks later, on November 13, 1979, plaintiff sent defendant a letter (Letter 5). Plaintiff wrote to defendant that he had "read, in detail, the notes which you prepared when I was last in New York [in October of 1979]", and plaintiff stated that, "I should like you to consider my comments hereinbelow with an eye toward your responses forming the basis for the general plan which I will then prepare for our rereview and eventual submission to our friends at BM [Bristol–Meyers]." After then discussing several matters relating to such a general plan, plaintiff wrote in the letter:

> Subject to our working out the specific details, when the immigration and tax elements have been reconciled, I continue to proceed on the assumption that you are in accord with the proposal I made to you in Palm Springs that our relative interests in the benefits to be derived from the association with Bristol Meyers (or any other major manufacturer/distributor) will be two-thirds (⅔) to you and one third (⅓) to me, with each of us making a contribution of points in relation to our respective interests in favor of Joan (for example, if I gave up 1–⅛% and you double, or 2–⅔%, it would leave you with 64%, me 32%, and Joan with 4%).

On November 26, 1979, defendant, writing in response to plaintiff's letter of November 13, sent a letter (Letter 6) to plaintiff in which he stated:

> I would like at this stage to comment on your proposal made in Palm Springs, which until now I have only been thinking about in the vaguest possible way. On giving it very serious thought I feel

that onethird, twothirds [sic] as you suggest is rather unbalanced, although I do agree that Joan should have a participation. I am also somewhat confused as to what the percentages deal with—just the product deal or all my income or separate percentages for separate things.

At present I gather you have 4⅓ (?) [sic] of Trichological Centre, New York and 10% (?) [sic] of me. It seems that 10% to 33% is a rather substantial jump. I realise of course that your contribution to the overall success so far is substantial and I do not wish for one moment to detract from that. You are not only a business associate but a very dear and close friend whose support has been wonderful. The deal with BM (or anyone) is a great opportunity for us and I don't want to appear to be even remotely ungrateful for anything. Quite the contrary, I am sure there is a compromise that would make us all happy. Maybe we can discuss it further either before your trip to New York by phone, or when you are here.

In December 1979, plaintiff and defendant met in New York, and from December 1979 through March 1980, the parties had a number of phone conversations concerning a product deal. Plaintiff's total collected fees related to defendant for 1979 were $8,000.

On March 24, 1980, plaintiff and defendant met with the President of Clairol, Don Shea, and other Clairol executives who outlined their ideas for an affiliation with defendant for a venture involving his hair product line. After certain correspondence with Clairol, plaintiff, on June 13, 1980, prepared a draft of a letter (Letter 7) to defendant—a letter which plaintiff concedes was never sent to or reviewed by defendant. Affidavit of Richard M. Rosenthal in Opposition for Summary Judgment ¶ 47 (hereinafter "Rosenthal Aff."). This draft letter refers to a new proposal which plaintiff was to send to Bristol Meyers. Plaintiff wrote, in draft form:

On the reaching of an accord, we would immediately institute the most beneficial legal structure under which the funds payable would be received and distributed in accordance with the understanding reached in March, pursuant to which gross sums receivable from the Bristol Myers deal and any exploitations we develop collaterally thereto are to be divided 75% to you and 25% to me.

It is my intention to prepare the formal agreement reflecting same (a) in conjunction with our entering into the deal with Bristol Myers or an alternate entity, and (b) as soon as we determine the nature of the deal and the best structure to use.

In late June 1980, however, Clairol (Bristol–Meyers) ended its interest in participating in a product deal. Thereafter, plaintiff contacted Cheeseborough Ponds, on behalf of defendant, but that company was in the midst of a corporate restructuring and was not interested in pursuing any new product contracts.

Plaintiff's total fees for 1980 were $8000, apparently paid by the Trichological Centre in New York.

In late January, 1981, plaintiff handled, on defendant's behalf, the purchase of a co-op in New York City, for which defendant had borrowed several hundred thousand dollars. Plaintiff and defendant also engaged Stanley Kohlenberg, a cosmetics industry management consultant, during approximately the same period.

At some time during the early spring of 1981, Joan Maizner informed plaintiff that defendant might be planning a product deal involving a Mr. Bernt Rathaus. From Los Angeles, plaintiff telephoned Mr. Rathaus, who "confirmed that he had been exploring some ideas with [defendant] Kingsley as his friend but that there was nothing concrete to discuss" with plaintiff. Rosenthal Aff. ¶ 54.

On July 1, 1981, plaintiff and his family returned to New York to re-establish residence. Approximately one week thereafter, plaintiff learned that defendant and Rathaus, without the participation of plaintiff, had established a new corporation, Kingsley Products, Inc. Pursuant to a fully executed contract, Rathaus obtained a 49% interest in the new corporation, and

Rathaus provided the company with $100,-000 capital. On November 21, 1981, plaintiff attended defendant's marriage to Joan Maizner; at that time, Ms. Maizner told plaintiff that defendant would "do right by you." Rosenthal Aff. ¶ 55. On December 7, 1981, plaintiff and defendant met, at which time plaintiff proposed that he would accept 15% of defendant's profits; defendant said he would consider the proposal. On December 8, 1981, however, plaintiff received a letter from defendant in which defendant indicated he would no longer employ plaintiff as his attorney.

In May, 1984, Kingsley Products, Inc., was sold to Eli Lilly & Company. Pursuant to that sale, Eli Lilly, through its subsidiary Elizabeth Arden, Inc., now owns and distributes defendant's scalp treatment and hair care products.

## DISCUSSION

### I. CONTRACT CLAIMS

Plaintiff has pleaded in his complaint, in the alternative, that the parties are bound by either a written contract or an oral contract, and that as a result of such contract, plaintiff is entitled to at least 25% of defendant's gross income from all projects initiated during the period plaintiff served as defendant's attorney.

Whether a contract be written or oral, however, it must nonetheless be a *contract*. Under New York law[2], the parties not only must have intended to be bound by the terms of the alleged contract, but the parties must also have reached agreement as to *all* material terms of the contract. Thus, as the Second Circuit has explained:

> [t]o consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation. If essential terms of an agreement are omitted or are phrased in too

indefinite a manner, no legally enforceable contract will result.

*Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir.1978) (citations omitted). *See also Interocean Shipping Co. v. National Shipping and Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972).

Moreover, it is also clearly established under New York law that the parties must themselves provide, with definite and concrete language, *all* material terms of their contract—a court cannot be asked to fill in material terms on which the parties themselves could not reach agreement. Thus, as the New York Court of Appeals has explained:

> before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. *Thus, definiteness as to material matters is of the very essence in contract law.* Impenetrable vagueness and uncertainty will not do.

*Joseph Martin, Jr., Delicatessen v. Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981) (citations omitted) (emphasis added). Where the parties have not themselves provided all material terms of their contract, there is no standard by which a court can determine what constitutes a breach of the agreement. As Judge Weinfeld has observed:

> [i]t is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or stan-

**2.** The parties agree, and the Court assumes, that New York law governs the substantive contract and fraud claims herein. *Cf. Gelb v. Royal Globe Insurance Company*, 798 F.2d 38, 44 n. 5 (2d Cir.1986), *cert. denied,* — U.S. —, 107

S.Ct. 1608, 94 L.Ed.2d 794 (1987). Moreover, the alleged contract at issue here was created primarily in New York, and was to be performed primarily in New York. Defendant's alleged promises were also made in New York.

dard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.

*Candid Productions v. International Skating Union*, 530 F.Supp. 1330, 1333–34 (S.D.N.Y.1982) (Weinfeld, J.). *See also Best Brands Beverage, Inc. v. Falstaff Brewing Corporation*, No. 87–7279 (2d Cir. November 9, 1987).

In this case, defendant will be bound to compensate plaintiff for his professional services, on the terms plaintiff suggests, only if the parties agreed, either in writing or orally, to *all* material terms and conditions of such payment. Thus, at the very least, the parties must have clearly and specifically agreed on the services to be paid for and the duration of the payments. *See, e.g., Ginsberg Machine Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir.1965) (Marshall, J.) (duration of an exclusive right to sell and manufacture is an "essential" term of a contract). Furthermore, where plaintiff claims to be entitled to a percentage of profits, there must be some identification of what "profits" are actually covered by the contract terms. In the present context, this means that summary judgment must be granted for the defendant unless plaintiff can establish that a genuine issue of fact exists as to whether all such material terms were agreed upon, either orally or in writing, by the parties.

## A. WRITTEN CONTRACT

■ The seven letters discussed above, represent the full set of writings which plaintiff claims demonstrate the existence of a written contract between the parties. However, none of these letters, separately or cumulatively, constitutes a valid and enforceable written contract binding defendant to compensate plaintiff at a rate not to exceed 25% of defendant's gross professional income.

### Letter 1

The letter of December 8, 1976, written by plaintiff to defendant, discusses some of the ideas raised at the August 1976 meeting between the parties in Long Island. Included in this letter is a proposal by plaintiff that he own five percent of the corporate shares of the new New York trichological center. Clearly, this letter is at most a proposal, not a contract; no acceptance of plaintiff's offer has been made by the defendant. More importantly, plaintiff does not claim that ownership of stock in the New York trichological center is one of the terms of the alleged written contract at issue here.

### Letter 2

The letter of January 31, 1977, written by defendant to plaintiff, responds to the proposal made by plaintiff in Letter 1. Defendant, however, does not accept plaintiff's proposal that he own five percent of the stock. Defendant instead writes, "I do feel that 5% for you is rather high. I know that you have put in lots of work but I expect that this will dwindle considerably when we get going. I certainly want you to have a percentage, but about 3% was in mind initially." At best, this language represents a counter offer rather than an acceptance. And again, in any event, plaintiff's stock ownership is not said to be a term of the contract alleged to exist in this case.

### Letter 3

This letter of September 15, 1977, written by defendant to plaintiff, discusses plans for the opening of the trichological center; but, with one exception, no mention is made of any agreement between defendant and plaintiff. The one exception is a hand-written postscript to the letter, in which defendant states, "I think that she [Lesley] has too many points of the equity anyway. You have been doing a lot of the administration which has been beyond her & [sic] I think that you should have more of hers (irrespective of the agreement you & I will make)."

However, this discussion of stock ownership in the new trichological center, as in Letters 1 and 2, does not appear relevant to the terms of the alleged contract at issue in this case. Moreover, while it is not clear what "agreement" defendant is discussing

in the last phrase of his postscript, it is clear that such an agreement, that "you and I *will* make," could only have been entered into *after* the writing of this letter—thus the terms of that future agreement cannot be said to have been included in the letter itself.

*Letter 4*

This document, dated August 30, 1979, is a memorandum written by one of defendant's accountants, and is based on a meeting of defendant and his accountants held in London on that same date. This memorandum primarily discusses defendant's personal and business assets, as well as the status of the defendant's new trichological business in New York. In reference to the ownership of the New York trichological center and the royalties on any products sold there, the memorandum states that, "[t]he situation is further confused by the fact that RR [plaintiff Richard Rosenthal] in his personal capacity is said to own 10% of PK [defendant Philip Kingsley] and thus of all PK's activities including the sale of products (and processes) invented and marketed by PK."

Given that this memorandum was drafted by an outside accountant, rather than plaintiff or defendant, it cannot be said to represent an agreement between the parties. At best, this memorandum may serve as evidence that some contract may have indeed been entered by the parties at some prior time. However, the memorandum itself also states that "[t]he contractual relationship between TCNY [the trichological center in New York], RR [plaintiff], DSP [Dream Street Productions, a company that, according to the memorandum, may actually hold defendant's interest in the New York center], and PK [defendant] requires further clarification." Since whatever information is embodied in that memorandum "requires further clarification," that memorandum cannot be said to embody the material terms of a contract between the parties in this action.

*Letter 5*

Letter 5, dated November 13, 1979, was written by plaintiff to defendant. The letter makes reference to "notes which [defendant] prepared when [plaintiff] was last in New York [in October 1979]." Plaintiff states that, "I should like you to consider my comments hereinbelow with an eye toward your responses forming the basis for the general plan which I will then prepare for our rereview and eventual submission to our friends at BM [Bristol–Meyers]." Clearly, any discussion of the "general plan" for a deal with a cosmetics company is merely a proposal; the letter itself contains only preliminary ideas that might, at most, form "the basis" of some final plan to be developed later.

The letter also discusses the respective interests of plaintiff and defendant in any deal with Bristol Meyers or another manufacturer/distributer. Plaintiff writes,

"Subject to our working out the specific details, when the immigration and tax elements have been reconciled, I continue to proceed on the assumption that you are in accord with the proposal I made to you in Palm Springs that our relative interests in the benefits to be derived from the association with Bristol Meyers (or any other major manufacturer/distributor) will be two-thirds ($\frac{2}{3}$) to you and one third ($\frac{1}{3}$) to me, with each of us making a contribution of points in relation to our respective interests in favor of Joan (for example, if I gave up 1–$\frac{1}{3}$% and you double, or 2–$\frac{2}{3}$%, it would leave you with 64%, me 32%, and Joan with 4%)."

While this letter may indeed embody the general terms of an agreement concerning the relative interests of the parties in a deal with a manufacturer/distributor, plaintiff himself states that the parties still need "[to] work [...] out the specific details", including "immigration and tax elements", and the interest of Joan Maizner. Thus, material matters still needed to be resolved before an agreement would be reached between the parties.

More importantly, this letter cannot be said to represent an agreement between the parties. Rather, plaintiff merely states that he is proceeding on an assumption that defendant "is in accord" with a *proposal* plaintiff made at Palm Springs; there is no

indication whatsoever that defendant ever actually accepted the terms stated here.

*Letter 6*

Letter 6, written by defendant to plaintiff on November 26, 1979, in response to Letter 5, makes clear that defendant in fact did not accept the terms stated in Letter 5. Rather, Letter 6 indicates that defendant considered the "proposal" plaintiff made at Palm Springs to be nothing more than that —a proposal. Indeed, defendant states that "I would like at this stage to comment on your proposal made in Palm Springs, which until now I have only been thinking about in the vaguest possible way." Not only does defendant explain that he feels the ⅔–⅓ split is "rather unbalanced", he also writes that he is "somewhat confused as to what the percentages deal with—just the product deal or all my income or separate percentages for separate things." The size of the parties' relative interests, and what aspects of the relationship between the parties would be included in the contract, are clearly material terms. Thus, it is clear that Letter 6 does not include agreements on all material terms of the relationship between the parties with respect to a product deal.

In fact, defendant only states that "I am sure there is a compromise that would make us all happy. Maybe we can discuss it further either before your trip to New York by phone, or when you are here." Defendant states that "[a]t present I gather you have 4⅓ (?) [sic] of the Trichological Centre, New York and 10% (?) [sic] of me. It seems that 10% to 33% is a rather substantial jump." Again, defendant indicates that any contract regarding the product deal will be worked out later, and certainly the relative interests of the parties in any such product deal were not yet agreed upon at the time Letter 6 was written.

*Letter 7*

Finally, Letter 7 is also not a written agreement between the parties. Letter 7 does make reference to an "understanding reached in March, pursuant to which gross sums receivable from the Bristol Myers deal and any exploitations we develop collaterally thereto are to be divided 75% to you and 25% to me." However, even if some oral agreement was entered into in March, this letter cannot be said to represent a binding contract between the parties —indeed, plaintiff admits that Letter 7 is merely a draft that plaintiff never even sent to defendant in any form. Anything said in Letter 7 cannot be considered a meeting of the minds of the parties.

\* \* \* \* \* \*

Plaintiff has thus made no showing whatsoever that any issue of material fact exists as to whether the parties ever entered a written contract. It is frivolous to suggest that any of the written documents, either alone or together, embodies all of the material terms by which the parties agreed to be bound.

## B. ORAL CONTRACT

In this case, plaintiff alleges that the contract he entered into guaranteed him compensation of 25% of defendants gross professional income, *whenever said income is received* from projects initiated during the period when plaintiff acted as attorney for defendant and defendant's business.

The very terms of plaintiff's allegations suggest that this contract could not be performed within one year. Plaintiff claims to be entitled to compensation for a period extending far more than one year past the date of any alleged oral contract between the parties; plaintiff cannot also claim that performance would occur in a one year period.

The New York Statute of Frauds, New York General Obligations Law § 5–701, provides that all contracts not to be performed within one year must be evidenced by some written document or set of written documents. The statute provides, in pertinent part, that:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith ... if such agreement, promise or undertaking ... [b]y its terms is not to be performed within one year from the

making thereof or the performance of which is not to be completed before the end of a lifetime.

N.Y.Gen.Oblig.Law § 5–701. Even where performance is subject to some contingency, such as the actual earning of profits, the statute of frauds will still apply to an agreement where performance will not be complete within one year. *See, e.g., Grissman v. Union Carbide Corp.*, 279 F.Supp. 413, 416 (S.D.N.Y.1968) ("[t]he existence of a contingency or condition precedent to the imposition of liability does not remove a contract from the bar of the Statute of Frauds"). *See also Nurnberg v. Dwork*, 12 A.D.2d 612, 208 N.Y.S.2d 799 (1st Dep't 1960), *aff'd mem.*, 12 N.Y.2d 776, 186 N.E. 2d 568, 234 N.Y.S.2d 721 (1962); *Martocci v. Greater New York Brewery*, 301 N.Y. 57, 63, 92 N.E.2d 887, 889, *reh'g denied*, 301 N.Y. 662, 93 N.E.2d 926 (1950).

Here, the alleged contract between the parties was not to be performed within one year, and thus any oral contract between the parties is subject to the Statute of Frauds. The New York courts have recognized that the Statute applies in circumstances similar to those of the present case. In *Nurnberg v. Dwork, supra,* for example, the Statute of Frauds was held to apply to an oral agreement whereby the plaintiff "was to negotiate for the operation of retail outlets [for defendants] in stores of [a third party], and the defendants were to pay to the plaintiff 1% of the gross retail sales of the defendants in said stores * * * if at any future time they establish concessions at [such] stores * * * so long as the concessions are maintained by the defendants." *Nurnberg v. Dwork*, 12 A.D.2d at 612–613, 208 N.Y.S.2d at 800. As the New York Court of Appeals later explained, in *Nurnberg* "there was no continuing duty of performance by the plaintiff; in return for a single service, he was to receive a percentage of sales forever. It was this fact—present in the prior 'service contract' cases—which led us to conclude that the agreement was within the Statute of Frauds." *North Shore Bottling Co. v. C. Schmidt and Sons, Inc.*, 22 N.Y.2d 171, 179, 239 N.E.2d 189, 193, 292 N.Y.S.2d 86, 92 (1968) (Fuld, C.J.).

At the summary judgment stage, plaintiff therefore has the burden of showing that some genuine issue of material fact exists as to whether some note or memorandum "thereof" be in writing. The "note or memorandum thereof" is not a contract itself, in that a written contract would eliminate the need to apply the Statute of Frauds. Nonetheless, "[i]n order to satisfy the statute the 'memorandum' must, on its face and without the addition of parol evidence, contain the essential terms of the agreement," *Ginsberg Machine Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir.1965) (Marshall, J.). As the Second Circuit has explained, "[a] term is 'essential,' and must thus appear in the 'memorandum,' if it seriously affects the rights and obligations of the parties and there is significant evidentiary dispute as to its content." *Id.* The duration of the right exclusively to manufacture and sell machines would be an example of an "essential term". *Id.* More recently, the Second Circuit has used even stricter language in discussing the memorandum requirement, indicating that "the statute also requires that 'all the material terms of the agreement' be contained either 'expressly or by reasonable implication' in the writing." *Hawley Fuel Coalmart, Inc. v. Steag Handel GmbH*, 796 F.2d 29, 33 (2d Cir.1986) (citing *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575, 245 N.E.2d 712, 715, 297 N.Y.S.2d 947, 953 (1969)), *cert. denied,* —— U.S. ——, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987).

New York law has long held, however, that the memorandum may actually be several writings which, taken together, satisfy the requirements of the Statute of Frauds; indeed, as the Second Circuit explained in *Hawley Fuel Coalmart*, "[u]nder New York law the writing necessary to satisfy the statute of frauds may be embodied in several documents, only one of which need be signed by the party to be charged." 796 F.2d at 33. *See also Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 55–56, 110 N.E.2d 551, 554 (1953).

█ In this case, however, it is clear that none of the writings, alone or together with

any of the other writings, is sufficient to meet the "note or memorandum" requirement of the Statute of Frauds.

Letter 1 and Letter 2, in relevant part, refer only to plaintiff's stock ownership in the new Trichological Center, and make no reference whatsoever to any interest in defendant's revenue or profits.

Letter 3, signed by the defendant, does make reference to "the agreement you & I will make"; however, it is not clear whether this "agreement" concerns stock ownership or some other subject. And the "agreement" in question clearly has not been reached at the time of this writing, and thus this letter cannot contain any essential terms of that agreement.

Letter 4 is a document prepared by defendant's accountant. This memorandum does state that "RR in his personal capacity is said to own 10% of PK and thus of all PK's activities including the sale of products (and processes) invented and marketed by PK." However, while the letter states a percentage interest of 10%, it does not indicate to what that interest attaches or the duration of the interest. Indeed, the memorandum itself states that the information about plaintiff's interest actually makes "the situation" be "further confused". And the memorandum also states that "[t]he contractual relationship between TCNYP, RR, DSP and PK requires further clarification."

Letter 5 merely presents a proposal by plaintiff that the proceeds of any product deal with a manufacturer/distributor be split two-thirds for defendant and one-third for plaintiff, although the letter also indicates that an interest for Joan Maizner would also need to be worked out. And any terms of an agreement proposed in Letter 5 are rejected by defendant in Letter 6. In Letter 6, signed by defendant, defendant not only rejects plaintiffs proposed two-thirds—one-third split, but also indicates that the scope of plaintiff's interest in any agreement is unclear. Defendant explicitly states, "I am also somewhat confused as to what the percentages deal with—just the product deal or all my income or separate percentages for separate things." And while defendant appears to indicate that some earlier oral agreement affecting plaintiff's interest may have been reached, defendant indicates that he is not even sure of the terms of that agreement by placing a question mark ("?") next to "10%". And finally, defendant states that "I am sure there is a compromise that would make us all happy"—indicating that essential terms of an agreement had yet to be resolved.

Finally, Letter 7 cannot rescue plaintiff from the failure of the other letters, alone or together, to state the essentials of an oral agreement between the parties. Letter 7 states new percentages—75% and 25%—not discussed in any of the other letters, and makes reference to an "understanding reached in March." Yet Letter 7, like the other letters, does not clearly state the items to which plaintiff's interest would apply, nor does it clearly state the duration of the interest. And in any event, given that Letter 7, by the plaintiff's own admission, is merely a draft never sent to defendant, its credibility as a document reflecting the understanding of the party to be charged—the defendant—is questionable.

Moreover, Letter 7 indicates that even if the parties had indeed reached some prior oral agreement, it was not a contract that would have bound the parties under New York law. Letter 7 states unequivocally that the interest of plaintiff discussed will be derived from "gross sums receivable from the Bristol Myers deal and any exploitations we develop collaterally thereto"; if this language is not to be treated as creating ambiguity as to the scope of plaintiff's alleged interest, it must be treated as establishing that consummation of a deal with Bristol Myers, or some other entity, was a condition precedent to performance under the alleged oral agreement between the parties. Such a deal with Bristol Myers was in fact never reached, nor was any collateral deal ever developed by the parties. Thus, by its own terms, Letter 7 cannot be deemed to state essential terms of an oral contract binding upon the parties.

\*    \*    \*    \*    \*    \*

Thus, because no writing or set of writings contains the essential terms of the alleged oral agreement between the parties, no genuine issue of material fact exists as to whether any oral contract between the parties is void under the Statute of Frauds.

Plaintiff asserts, however, the defendant must be equitably estopped from asserting his statute of frauds defense because plaintiff relied on defendant's promises of compensation, plaintiff took actions which unequivocally refered to their agreement, and plaintiff was substantially injured as a result.

Promissory estoppel, when invoked to excuse compliance with the Statute of Frauds, is distinct from the more common invocation of promissory estoppel to enforce a promise without any agreed consideration. Indeed, while Section 90 of the Restatement of Contracts Second discusses promissory estoppel as a consideration substitute, New York Courts look to Section 217A of the Restatement for the principle that a party can be estopped from asserting a Statute of Frauds defense. Section 217A provides, in relevant part:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce the action or forebearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

See, Swerdloff v. Mobil Oil Corp., 74 A.D.2d 258, 261, 427 N.Y.S.2d 266, 269 (2d Dept.1980), cited in Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc., 804 F.2d 787, 794 (2d Cir.1986).

The doctrine of promissory estoppel as a bar to assertion of a Statute of Frauds defense, has been strictly construed to apply only in those rare cases where " 'the circumstances [are] such as to render it unconscionable to deny' the oral promise upon which the promisee has relied," Swerdloff, 74 A.D.2d at 263, 427 N.Y.S.2d at 269 (citing 3 Williston, Contracts [3d ed.], § 533A, p. 801). Cf. Murphy v. Gutfreund, 583 F.Supp. 957, 968 (S.D.N.Y. 1984) (Lasker, J.) (more stringent pleading requirements apply when the doctrine of promissory estoppel is invoked as a defense to the Statute of Frauds). Thus, as the Second Circuit has explained:

The strongly held public policy reflected in New York's Statute of Frauds would be severely undermined if a party could be estopped from asserting it every time a court found that some unfairness would otherwise result. For this reason, the doctrine of promissory estoppel is properly reserved for the limited class of cases where "the circumstances are such as to render it *unconscionable* to deny" the promise upon which the plaintiff has relied.

*Philo Smith & Co., Inc. v. USLIFE*, 554 F.2d 34, 36 (2d Cir.1977) (emphasis in original) (citation omitted).

Where an alleged contract is made void by the Statute of Frauds, an injury that is solely the result of non-performance of that void agreement is not sufficiently "unconscionable" to allow a party to estop reliance on the Statute of Frauds defense. *See Philo Smith & Co., Inc. v. USLIFE*, 554 F.2d at 36. In *USLIFE*, a written finder's fee agreement was in effect between the parties, but had expired by the time defendants reached an agreement with a third party found by the plaintiffs. Plaintiff claimed that the parties had orally agreed to extend the written finder's fee agreement, but such an oral extension was barred by New York's Statute of Frauds. Plaintiff then argued that because it had detrimentally relied upon the defendant's promises to extend the written agreement, defendant should be estopped from asserting the Statute of Frauds defense; the only substantial injury suffered by the plaintiff, however, was the loss of a fee from the defendant. The Court of Appeals explained that "this is not the kind of injury contemplated by New York law, for it is solely a result of the non-performance of a void agreement." *Id.* Moreover, the Court of Appeals found that plaintiff's relinquishment of the opportunity to seek

another party willing to pay a finder's fee was "hardly ... the sort of irremediable change in position normally associated with the doctrine of promissory estoppel." *Id.; see also Woolley v. Stewart*, 222 N.Y. 347, 350–51, 118 N.E. 847, 848 (1918) (the acts induced by reliance must be "to such an extent and so substantial in quality as to irremediably alter his situation and make the interposition of the [Statute of Frauds] a fraud.").

■ The circumstances of the present case are not such as to render it "unconscionable" to deny enforcement of any promise on which plaintiff may have relied. In its complaint, plaintiff has not alleged any injury resulting from reliance on any promise made by defendant. At best, plaintiff has only argued in its summary judgment papers that as a result of reliance on defendant's promisses, it did not collect the fees required under the alleged agreement. But this is merely a loss from nonperformance of a void agreement. Plaintiff took no action that can be said to have irremediably altered his situation; plaintiff has not shown that he invested money or suffered any substantial losses attributable to reliance on any oral promises made by the defendant. Moreover, to the extent that the correspondence between the parties indicates defendant's continued requests for clarification and further negotiation as to the terms of any fee agreement between the parties, defendant in any event did not make a promise upon which plaintiff could reasonably rely.

## II. FRAUD CLAIM

Plaintiff's third cause of action alleges that defendant fraudulently induced plaintiff to act as a professional consultant by falsely representing that defendant would compensate plaintiff for those services at a rate not to exceed 25% of defendant's gross professional income. Defendant, relying on *England Strohl/Denigris, Inc. v. Weiner*, 538 F.Supp. 612, 615 (S.D.N.Y.1982), *aff'd*, 740 F.2d 954 (1984), claims that summary judgment should be granted because "[i]t is well established that an action for fraudulent misrepresentations made to induce a party to enter a contract, cannot be based upon an oral contract void under the statute of fraud [sic]." Defendant's Memorandum of Law at 30.

■ Defendant, however, ignores the analysis of the Second Circuit in *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784 (2d Cir.1986), indicating that "a party barred by the Statute of Frauds from pursuing a breach of contract claim is not necessarily barred from pursuing an action in tort." *Id.* at 792. While a party may not claim that the "fraud" consisted of a failure to honor an alleged oral promise, a party *may* properly bring a claim for fraud, even if the alleged contract is barred by the Statute of Frauds, if the fraud consists of false representations that services would indeed be paid for. In other words, plaintiff here must show more than the mere failure to perform a non-fraudulent promise; rather, plaintiff must show that defendant made a promise he had no present intention of performing. *See Lehman v. Dow Jones & Co.*, 783 F.2d 285, 295 (2d Cir.1986), *cited in Fort Howard Paper Co.*, 787 F.2d at 794.

Thus, the Statute of Frauds cannot be used as a shield for wrongdoers. *See Imperator Realty Co. v. Tull*, 228 N.Y. 447, 457, 127 N.E. 263 (1920) (Cardozo, J. concurring). On the other hand, a fraud claim cannot merely reassert, in another form, a claim for the breach of a contract barred by the Statute of Frauds; any recovery for fraud therefore must be limited to expenses incurred in reliance on the fraud. *Fort Howard Paper Co.*, 787 F.2d at 794. Thus, as the Second Circuit has explained:

[a] careful balance [ ] must be struck if the legislative intent underlying the Statute of Frauds is not to be subverted. By restricting a fraud claimant to an out-of-pocket recovery, along with any punitive damage award a jury may accept, it is possible to return the claimant to the same position he occupied before the fraud was committed without facing the attendant risk of indirectly enforcing a contract otherwise barred by the Statute of Frauds. "Because an out of pocket recovery is practically and theoretically

different from that obtained by enforcement of the contract, permitting the fraud action does not defeat the policy underlying the Statute of Frauds."

*Fort Howard Paper Co.*, 787 F.2d at 794–95 (citations omitted).

■ In the present case, plaintiff has made no showing that a genuine issue of fact exists as to whether defendant promised, without intending to perform, that he would compensate plaintiff for his services at a rate not to exceed 25% of defendant's gross professional income. There is no indication whatsoever that in August 1976, the date of the first promise, defendant fraudulently represented that he intended to pay plaintiff a percentage of his gross United States income. Indeed, the correspondence between the parties indicates that at the time of the promise, defendant did plan to compensate plaintiff—although defendant did make clear that he himself was uncertain as to the terms of that compensation.

In 1978 and 1979, when the parties discussed a possible product deal with a beauty product distributor or manufacturer, plaintiff sought a larger percentage interest in income from defendant's business. Again, however, even assuming that defendant made an oral promise to give plaintiff 25% of all profits, there is no indication whatsoever that defendant made any fraudulent promise to compensate plaintiff. According to plaintiff, "[w]e argued back and forth ... until some time in New York in late March [1980] when we finally agreed to my getting 25%. This was only a few days before we went to Bristol–Myers with a full-blown proposal which I had personally devised and written up." Rosenthal Aff. ¶ 42.

In the months that followed, the parties continued to pursue the deal with Bristol–Myers. It was not until the Spring of 1981, however, that defendant entered into a separate transaction involving Mr. Rathaus and excluding plaintiff. And it was only at that time—not at the time any promise to compensate plaintiff was made—that defendant decided to enter that separate transaction. The *only* explanation plaintiff offers for defendant's decision is that defendant and his wife

> implored me to understand that Kingsley was feeling the pressure of a big mortgage, rising overhead, a little baby, and the fact of his turning 51. It was explained that Kingsley was depressed and that he felt the deal with Rathaus was his last shot.... Kingsley and Joan Maizner told me that Kingsley had hidden the deal from me because Rathaus had made it clear to Kingsley that he "would not do the deal with Kingsley" if I had any involvement whatsoever.

Rosenthal Aff. ¶ 24; Rosenthal Deposition, April 29, 1985, at p. 56. According to plaintiff, the new contract between defendant and Rathaus was executed approximately one month before plaintiff became aware of its existence. Thus, it was not until early 1981 that defendant chose to enter a deal that would deny plaintiff any compensation. At that time, over one year had passed since any alleged promise had been made; at most, defendant decided not to *perform* as he had allegedly promised. If any "fraud" was committed, it was defendant's failure to *perform;* but this merely reasserts, in another form, plaintiff's claim for breach of a contract barred by the Statute of Frauds. *See Fort Howard Paper Co.*, 787 F.2d at 794.

Thus, while plaintiff has properly pleaded that defendant fraudulently *promised* to compensate plaintiff, in fact plaintiff has shown nothing more than that defendant did not *perform* under the terms of the alleged contract. Plaintiff's complaint alone, however, is not sufficient to meet plaintiff's burden in response to the motion for summary judgment. *See* Fed.R.Civ.P. 56(e) (a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegation or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial"); *see also Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. at 2510 ("in the face of defendant's properly supported motion for summary judgment, the plaintiff could not rest on his allegations of a conspiracy to get to a jury

without 'any significant probative evidence tending to support the complaint.' ") (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

Thus, as to plaintiff's fraud claim, defendant's motion for summary judgment is also granted.

## III. ACCOUNTING AND DECLARATORY JUDGMENT

Because defendant's motion for summary judgment is granted as to plaintiff's contract and fraud claims, plaintiff is not entitled to either an accounting to determine the amount of money owed by defendant, or any declaratory relief. Therefore, defendant's motion for summary judgment is also granted as to defendant's fourth and fifth causes of action, seeking an accounting and declaratory relief.

## CONCLUSION

Defendant's motion for summary judgment is thus granted as to all counts of the complaint.[3] Plaintiff's complaint is accordingly dismissed.

SO ORDERED.

---

**3.** Because summary judgment has been granted on all contract and fraud claims, the Court need not consider whether, as defendant suggests, those claims are barred by reason of plaintiff's breach of a fiduciary duty to defendant.