SUTTON HILL ASSOCIATES, a partnership, Plaintiff,

v.

Michael LANDES, Albert Schwartz and RKO Cinema 5 Theatre Corporation, Defendants,

James J. Cotter, Michael R. Forman, Sutcin Holding Corporation, City Cinemas Corporation and Royal Insurance Company of America, Additional Defendants on Counterclaims.

No. 87 Civ. 8452 (PKL).

United States District Court, S.D. New York.

Jan. 30, 1989.

Rosenman & Colin, New York City (Steven Wolowitz, Richard L. Claman, Jeffrey Delott, of counsel), for plaintiff.

Graubard Mollen Dannett & Horowitz, New York City (Scott E. Mollen, Jack Weinberg, Scott E. Hershman, of counsel), for defendants.

## OPINION AND ORDER

LEISURE, District Judge.

This motion involves the contested right to possession of two valuable East Side Manhattan cinema properties, the Sutton Theatre ("Sutton") and the Murray Hill Theatre ("Murray Hill," collectively the "Theatres"). Plaintiff seeks partial sum-

mary judgment granting the declaratory relief sought in its complaint and reply to counterclaims, as well as dismissal of the defendants' defenses and counterclaims that relate to possession of the Theatres.[1]

Defendants were tenant leaseholders of the Theatres. The lease expired by its terms on August 15, 1988. Defendants brought a preliminary injunction motion seeking to enjoin plaintiff from dispossessing them. That injunction application was denied by this Court upon oral findings made in a proceeding on July 27, 1988.[2] While plaintiff thus regained possession of the Theatres, the ultimate right to possession, of course, awaits the disposition of the merits in this case. In that regard, plaintiff's counsel represented that the Theatres would not be sold or leased pending this Court's determination of the merits of the claims relating to possession. Plaintiff now moves for partial summary judgment pursuant to Fed.R.Civ.P. 56.

*Factual Background.*

The present dispute essentially arises out of a series of business transactions and relationships that turned sour. The details and history of those business relationships, as they relate to possession rights to the Theatres, are therefore relevant.

Prior to August 16, 1985, the Theatres were owned by the Sutcin Holding Corporation ("Sutcin"). Sutcin was wholly owned, through intermediate entities, by Michael R. Forman ("Forman") and related family trusts (the "Forman Family"). Sutcin, through subsidiaries, had various interests in the Theatres and other motion picture houses that, together, comprised the Cinema 5 chain. The Forman Family had also previously controlled two other movie chains, the RKO circuit and the Brighton Theatre circuit.

Defendants Michael Landes ("Landes") and Albert Schwartz ("Schwartz") purchased the RKO and Brighton Theatre circuits from the Forman Family in 1981 and 1982. In 1985, Landes and Schwartz[3] entered into negotiations with James J. Cotter ("Cotter") and discussed a multi-faceted transaction regarding the Cinema 5 chain wherein Landes and Schwartz would: lease the Theatres; purchase the interests of certain other Cinema 5 theatres from Forman and the Forman Family; and book films and perform administrative functions for the Cinema I and II theatres ("Cinema I & II"), which was another Forman Family interest.[4]

Ira S. Levin ("Levin") and attorneys from Botein Hays & Sklar, were in-house and outside counsel, respectively, for Sutcin. Extensive drafting negotiations occurred over the lease of the Theatres (the "Lease") between Sutcin representatives and Landes, Schwartz, and their counsel Daniel Krause ("Krause"). These negotiations included two face-to-face meetings, numerous telephone conversations, and review of at least six drafts of the lease. These drafting negotiations occurred simultaneously, and in conjunction with, negotiations of the purchase and booking agreements noted above.

The Lease contained a right of first refusal provision, which will be discussed in

---

1. There are various counterclaims for money damages, including claims involving insurance monies and counterclaim defendant Royal Insurance Company of America, that are not at issue in this motion. The Court expresses no present opinion on the merits of those claims, except to the extent that they devolve upon factual findings made herein.

2. The transcript of that proceeding was adopted as a written order of this Court and filed on August 1, 1988. The findings and conclusions stated at that proceeding comprised the findings of fact and conclusions of law required for the disposition of the preliminary injunction under Fed.R.Civ.P. 52(a).

3. Landes and Schwartz are the principals in defendant RKO Cinema 5 Theatre Corporation, and in the transactions that are the subject matter of this lawsuit. "Defendants" used here will refer to those two individuals, unless the context indicates otherwise.

4. The ownership rights to Cinema I & II were, at the time of the above noted negotiations, the subject of an arbitration proceeding which is unrelated to the present action. Therefore, buying and booking arrangements only, as opposed to an outright lease, were negotiated by the parties to this litigation with regard to Cinema I & II. Transcript of Deposition of Albert Schwartz ("Schwartz Dep."), at p. 161.

more detail below. *See,* Lease §§ 22.01–04, attached as Exhibit 1 to Affidavit of Steven Wolowitz, Esq., sworn to on June 17, 1988 ("Wolowitz Aff."). During the drafting of the Lease, particular attention was paid to this provision.

The Lease, along with the purchase agreement and booking agreement, was executed on August 16, 1985. On that same day, Landes and Schwartz transferred their rights under that Lease to Cinema 5, which they now wholly owned. This transfer was made with the written consent of Sutcin.

The Forman Family, through Sutcin's retained ownership of the Theatres and Cinemas I & II, maintained interests in Manhattan cinemas. The Forman Family completely divested itself of those interests through a transaction between Sutcin and the current plaintiff to this action, Sutton Hill Associates ("SHA").

SHA is a partnership comprised of Forman and Cotter. Cotter had no previous ownership interest at all in Sutcin, or the Forman Family cinema interests. The SHA partnership was formed, and the transfer of the Theatres and Cinema I & II to it effected, by instruments drafted by Levin and Botein Hays & Sklar. The transfer was characterized as a "sale" of the cinema interests, and the documents were back-dated to August 16, 1985. Thus, Forman himself (through the SHA partnership) directly acquired the Manhattan cinema interests that the Forman Family previously held (through Sutcin), and that Forman had previously held only indirectly.

The sale of the cinema interests by Sutcin to SHA was intricately structured. SHA would purchase the Theatre buildings outright, and obtain a seven-year option to purchase the underlying land. The aggregate purchase price, $10 million, reflected independent appraisals that Sutcin had previously obtained for the properties. Affidavit of Ira S. Levin, Esq., sworn to on June 17, 1988 ("Levin Aff."), ¶ 16. Payment to Sutcin was by means of a note, which called for 10% interest payments on the purchase price for seven years, and 13% for the next eight years, and then payment in full of the principal. That note was secured by a mortgage.

Defendants Landes and Schwartz were formally notified of the transfer of the landlord interests in the Theatres from Sutcin to SHA in early February, 1986.

Landes and Schwartz investigated development strategies that might enhance the profitability of the Theatres, and discussed those plans with Cotter. Specifically, Landes and Schwartz initiated investigations into plans for multiplexing the Theatres, and investigated the acquisition of contiguous and nearby properties.

On the evening of July 15, 1986, ten months after Landes and Schwartz took possession of the Murray Hill, the upper plaster ceiling of that theatre collapsed. The landlord SHA undertook the repairs of the Murray Hill, which remained completely closed for a very long period—until June 10, 1988. Landes and Schwartz had no use of, or access to, the Murray Hill during this period.

In late spring of 1986, prior to the fall of the ceiling at the Murray Hill Theatre, the Cineplex Odeon Corporation ("Cineplex") approached Landes and Schwartz with an attractive offer to buy the RKO and Cinema 5 theatre circuits, which included the Theatres. Shortly after the collapse of the Murray Hill ceiling, Landes and Schwartz entered into an agreement with Cineplex whereby Cineplex would purchase the RKO and Cinema 5 interests from Landes and Schwartz, who would then sublet or assign the Lease to Cineplex (the "Cineplex Agreement"). The Lease of the Theatres required landlord consent for any transfer or sublease to a party other than a subsidiary of Landes and/or Schwartz. Lease § 18.01. The Cineplex Agreement contained a "penalty" provision in the event that Landes and Schwartz could not secure such consent.

SHA did not consent to the sublease to Cineplex. Levin Aff. ¶ 21. Cineplex negotiated directly with Cotter to attempt to buy the Theatres from SHA outright, but the parties could not come anywhere close to agreeing on a price.

Landes and Schwartz then altered the structure of their deal with Cineplex. They assigned the rights of the Lease back from Cinema 5 to themselves personally. Cineplex was given the right to book and buy for the Theatres during the Lease term, and for any extensions that Landes and Schwartz might obtain. The modification provided that "if and when" the Murray Hill opened, Cineplex would book and buy for it, as well as for the Sutton. Until defendants were dispossessed from the Theatres, Cineplex did book and buy for the Sutton, and advertised it as part of its circuit. Notwithstanding the Cineplex Agreement's "penalty" provision for failure to obtain consent to a sub-let, the ultimate purchase price for the Cinema 5 circuit and Theatres was not altered from the amount upon which Cineplex, Landes and Schwartz originally agreed.

In 1987 SHA set out to acquire, in its own right, additional direct interests in the Manhattan cinema business. Cineplex, apparently as a result of other cinema acquisitions and consequent intervention by the Antitrust Division of the U.S. Department of Justice, divested itself of five screens. SHA acquired interests in those screens, and formed, as a subsidiary, the City Cinema Circuit ("CCC"). As of June 1988, CCC consisted of eleven screens. SHA had actual ownership interests in five of those screens, and CCC was the booking, buying, and/or managing agent for six screens owned by unrelated parties.

A newspaper article appeared on August 24, 1987 (the "article") that was based on interviews with Ralph Donnelly, an executive with the newly formed CCC. Exhibit 26, attached to Affidavit of Albert Schwartz, Esq., sworn to on July 7, 1988 ("Schwartz Aff."). That article seemed to indicate that SHA contemplated leasing the Theatres to CCC upon expiration of the Lease. Schwartz and Landes wrote to SHA, expressing their position that such an action would violate the right of first refusal provision of the Lease. SHA responded that it did not intend to "lease" the Theatres, but that it considered operating the Theatres itself upon the expiration of the original three year provision of the Lease.

As a result of these and other correspondence, the present action was commenced. At issue in this motion are various claims relating to the right to possession of the Theatres. The theories of these various claims will be examined with relation to the Lease, controlling law, and such material facts which are presently not in issue.

*Discussion.*

Defendants' arguments that they are entitled to continued possession of the Theatres after the August 15, 1988 expiration of the Lease fall into three broad categories. The first of these relate to defendants' arguments that a valid joint venture agreement existed between Landes and Schwartz on the one hand, and Cotter and Forman on the other. This purported joint venture agreement is said to entitle defendants to possession of the Theatres, and its alleged existence is said to create material issues of fact that preclude summary judgment.

Secondly, defendants' seek to have the Lease reformed, essentially to add what they allege was a mutually understood agreement that Forman and/or Cotter entities would not directly enter the cinema business in New York (a "self-operation proscription"). Additionally, with respect to the Murray Hill, defendants urge reformation of the Lease to include a provision extending the term of the Lease for the period that the theatre was closed, following the collapse of the ceiling (a "lease extension provision").

Third and finally, defendants make several arguments relating to the right of first refusal clause, Lease §§ 22.01–04. With respect to that clause, defendants argue; 1) that the sale of the Theatres to SHA by Sutcin was really a "lease," made without affording defendants the required opportunity to renew; and 2) that SHA either has, or will, "lease" the Theatres to its subsidiary CCC, in violation of the refusal clause.

## I. Standards for Summary Judgment.

Summary judgment may be granted pursuant to Fed.R.Civ.P. 56(c) where "there are no unresolved factual disputes as to

issues material to the outcome of the litigation." *The King Service, Inc. v. Gulf Oil Company,* 834 F.2d 290, 295 (2d Cir.1987).

The substantive law governing the case will determine those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The relevant "outcome" in this motion, of course, relates to the conflicting claims regarding the right to possession of the Theatres. The Court's function in a summary judgment motion is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. *See also, Heyman v. Commerce & Indus. Ins.,* 524 F.2d 1317 (2d Cir.1975).

The party seeking summary judgment bears the initial burden of informing the Court of the nature and basis of its motion, and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving party is not required, however, to produce "affidavits or other similar materials *negating* the opponent's claim." *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2553 (emphasis in original). *See generally,* Schwarzer, Summary Judgment under the Federal Rules: Defining Genuine Issue of Material Fact, 99 F.R.D. 465, 487–88 (1984). The burden is discharged by " 'showing'— that is, pointing out to the District Court— that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

When this initial showing is made, it becomes the non-moving party's burden "to set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; *King Service Inc.,* 834 F.2d at 295. In ascertaining whether there are material issues to be tried, the Court must "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see also Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985). If a material factual issue may only be determined by a *trier* of fact, namely, if the material issue could reasonably be resolved in favor of either party, summary judgment is not proper.

The non-moving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also, King Service Inc. v. Gulf Oil Corp.,* 834 F.2d 290, 294–95 (2d Cir.1987); *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 510, 511 (2d Cir.1989); *Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1115 (S.D.N.Y.1987). Additionally, disagreement as to "ultimate facts or conclusions" will not make summary judgment by the Court improper, where the material facts pertinent to the movant's motion are not legitimately disputed. *Burroughs Wellcome Co. v. Commercial Union Insurance Co.,* 642 F.Supp. 1020, 1022 (S.D.N.Y.1986).

As will become apparent below, the defendants in this action have heightened burdens of evidentiary proof with regard to certain elements of their claims. Reformation of the Lease, in particular, must be established by *"clear, positive and convincing evidence." Amend v. Hurley,* 293 N.Y. 587, 595, 59 N.E.2d 416 (1944) (emphasis in original). In evaluating the showings made by both sides, relative to the existence of material factual issues sufficient to warrant trial, these heightened burdens of proof are properly considered by the Court.

*Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## II. Right to Possession of the Theatres.

### 1. The Joint Venture Agreement.

■ Defendants strenuously argue that the lease must be placed into the context of a multifaceted oral joint venture agreement between themselves, and Cotter and Forman. *See, e.g.,* Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Cross-Motion for a Preliminary Injunction ("Defendants' Mem."), at pp. 27–29; Defendants' Statement Pursuant to Local Civil Rule 3(g). The purpose of this oral joint venture was, essentially, to acquire and develop properties, and specifically the subject motion picture properties, for the mutual profit of the joint venturers.

Defendants urge that the existence or non-existence of a joint venture agreement in this case is an issue that is not properly determinable on a summary judgment motion. With this limited proposition, the Court would agree. While plaintiff disputes the existence of the joint venture, it apparently concedes that, on the present record, it might be reasonable to infer the existence of a joint venture. Plaintiff's Reply Memorandum of Law in Support of its Motion for Partial Summary Judgment ("Plaintiff's Reply Mem."), at pp. 6–7. The existence of a joint venture agreement in the present situation necessarily involves questions of the parties' intent, which is the classic situation where summary judgment is *not* proper. *See, e.g., Bachus Plywood v. Commercial Decal Inc.,* 208 F.Supp. 687, 692 (S.D.N.Y.1962) ("Since

some of the elements necessary to characterize an agreement as one of joint venture are dependent upon the intent of the parties, ordinarily a trial would be necessary to establish that intent."); *Wakefield v. Northern Telecom, Inc.,* 813 F.2d 535, 540 (2d Cir.1987).[5]

Defendants are erroneous, however, in their assertion that a factual dispute over whether a joint venture existed precludes summary judgment here. As noted above, the Court's inquiry proceeds in the context of the controlling substantive law.[6] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Assuming that there was a joint venture as defendants describe it, the determinative legal effect of the alleged joint venture *is* presently ascertainable. There are no disputed material issues, relative to the legal effect of the alleged joint venture, which constitute "genuine issue[s] for trial." *Id.* at 249, 106 S.Ct. at 2511. *See generally, Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 509–10 (2d Cir.1989).

Essentially, defendants cannot rely on their postulated joint venture, because such a joint venture would be subject to, and not in compliance with, the New York statute of frauds provision. New York General Obligations Law § 5–701(a)(1) provides that "Every agreement ... is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, ... if such agreement ... [b]y its terms is not to be performed with one year from the making thereof...."[7]

---

5. Mere invocation of "intent," of course, does not automatically place state of mind in issue and render summary judgment improper. For example, summary judgment may clearly be granted against a party urging reformation of a written instrument, even though such a determination necessarily involves an implicit judgment regarding the parties' intent. *See,* Part 2, infra.

6. The parties agree, and this Court therefore assumes, that New York law governs the substantive issues here. *Gelb v. Royal Globe Insurance Co.,* 798 F.2d 38, 44 n. 5 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).

7. Defendants correctly note that there is nothing about an oral joint venture agreement itself that violates the statute of frauds. *Dura v. Walker, Hart & Co.,* 27 N.Y.2d 346, 318 N.Y.S.2d 289, 267 N.E.2d 83 (1971). Neither is a contract automatically immune from the requirements of the statute of frauds, however, because it is "joint venture" agreement. As indicated by the discussion above, the nature of the particular joint venture agreement here implicates the statute of frauds.

The alleged joint venture had no specific expiration date; it purportedly gave Landes and Schwartz "perpetual" rights to develop the Theatre properties. The three year Lease was part of the alleged joint venture. Decisions regarding the "highest and best use" of the Theatre properties would be made by all of the parties to the joint venture, within the three year term of the Lease. Transcript of Deposition of Michael Landes ("Landes Dep."), at p. 271; Schwartz Aff. ¶ 6. Further specific agreements to multiplex the Murray Hill, and extend the three year Lease for that cinema, were also allegedly made pursuant to the joint venture agreement. Second Amended Answer and Counterclaims ¶ 105. The agreement was made in "1983 or 1984." Landes Dep. at pp. 33–37.

From the above, it is clear that performance of the joint venture agreement could not possibly have occurred within a one year period. The contemplated term was "perpetual," and the specific undertaking involved at least a three year lease. The agreement falls squarely within the explicit terms of N.Y.Gen.Oblig.Law § 5–701. *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1123 (S.D.N.Y.1987); *Rothfield v. Clinger*, 91 A.D.2d 939, 940, 458 N.Y.S.2d 549 (1st Dep't 1983).

Defendants argue that the statute of frauds would not render their joint venture void because the agreement was "terminable within a year." Defendants' Mem. at p. 21. It is true that certain types of contracts that are terminable "for just cause within one year, *without any breach*," are not barred by the statute of frauds. *See, e.g., Ohanian v. Avis Rent a Car System, Inc.*, 779 F.2d 101, 108 (2d Cir.1985).

In this regard, defendants urge that because their alleged joint venture agreement was "perpetual" and had no explicit termination date, it was terminable "at will" within one year. Defendants cite *Weisman v. Awnair Corp. of America*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957) and *Yonofsky v. Wernick*, 362 F.Supp. 1005 (S.D.N.Y.1973) for the proposition that a joint venture agreement without a fixed termination date is automatically terminable at will by either party within one year, and thus not subject to the statute of frauds. Neither case so holds. *Weisman* does not mention the statute of frauds. *Yonofsky* states;

There is authority indicating that when the duration of a joint venture is not fixed by agreement and *when the venture is not formed for a particular purpose to be accomplished by an agreed upon method,* then the joint venture is terminable at will by either party to the adventure.

362 F.Supp. at 1027 (footnotes omitted) (emphasis supplied). As the above discussion indicates, the particular purpose of the present alleged joint venture involved the development of the specific cinema properties, and the agreed upon method for that development included, at a minimum, a three year lease.

Defendants' position is dependant upon the assumption that the joint venture had no minimum fixed period of performance. This argument is flatly contradicted by the very terms of the joint venture agreement alleged by the defendants. The purported joint venture contemplated, at a minimum, a three year lease of the Theatres. Schwartz Affidavit ¶ 6. The joint venture was only "terminable" within a year in the same sense that every contract is terminable at any time, namely by either party's breach.[8]

Defendants cannot rely on the alleged joint venture as a basis for continued possession of the Theatres. Such a joint venture agreement would be, as a matter of law, barred by the New York Statute of Frauds, N.Y.Gen.Oblig.Law § 5–701. *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1123 (S.D.N.Y.1987).[9]

---

8. The defendants had no understanding as to any conditions that would terminate, "at will" or otherwise, the joint venture agreement. Landes Depo. at p. 271.

9. Plaintiff additionally argues that the joint venture agreement would be barred by the statute of frauds provision dealing with interests in real property, N.Y.Gen.Oblig.Law § 5–703(2). If the essence of a "joint venture" agreement is the

2. Reformation of the Lease.

■ Defendants argue that they are entitled to possession of the Theatres under reformation of the Lease itself. As noted above, there are two alleged agreements that are said to constitute rights under the Lease, even though not included in the written terms of the Lease. These provisions are a self-operation proscription on the part of Cotter and Forman, and a lease extension provision regarding the Murray Hill.

There are well-established, and strict, standards that apply to reformation claims in New York. These standards have been recently reaffirmed by the New York Court of Appeals in *Chimart Associates v. Paul,* 66 N.Y.2d 570, 571, 498 N.Y.S.2d 344, 345, 489 N.E.2d 231, 232 (1986):

> Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations.

Reformation may be granted only in two narrow circumstances: mutual mistake, or unilateral mistake plus fraudulent concealment. *Chimart,* 66 N.Y.2d at 573, 498 N.Y.S.2d at 346–37, 489 N.E.2d at 233–34.

### A. Standards for Reformation.

The New York Court of Appeals in *Chimart* defined "mutual mistake": "In a case of mutual mistake, the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." *Id.* at 573, 498 N.Y.S.2d at 347, 489 N.E.2d at 234. Implicit in that definition is the requirement that the parties originally *intended* that the excluded agreement be included in the written instrument. *See, e.g., Sullivan's of Liberty, Inc. v. Burroughs Corp.,* 57 A.D.2d 664, 393 N.Y.S.2d 626, 627 (3d Dep't 1977) (no reformation of instrument, where it was undenied that the parties had agreed that a system should function, "but there is no indication that they ever intended to include a definite provision to that effect in this contract ..."). *See also, John Hancock Mut. Life v. Carolina Power & Light,* 717 F.2d 664, 671 (2d Cir.1983); 13 *Williston on Contracts* § 1549 at 132–33 (3d ed. 1970).

Fraudulent concealment was defined by the *Chimart* court as a situation where "the parties have reached agreement and, unknown to one party but known to the other (who misled the first), the subsequent writing does not properly express that agreement." 66 N.Y.2d at 573, 498 N.Y.S. 2d at 347, 489 N.E.2d at 234. As in mutual mistake, the party seeking to reform an instrument because of fraudulent concealment must establish that he thought, or intended, that the omitted provision was included in the written instrument. *See, Barash v. Pennsylvania Terminal Real Estate Corp.,* 26 N.Y.2d 77, 87, 308 N.Y.S. 2d 649, 656, 256 N.E.2d 707, 712 (1970).

Finally, there is a heavy "procedural" burden that must be overcome by the party seeking to reform a lease. This burden is manifested in a " 'heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties' and a correspondingly high order of evidence is required to overcome that presumption." *Chimart,* 66 N.Y.2d at 574, 498 N.Y.S.2d at 347, 489 N.E.2d at 234 (quoting *Backer Mgt. Corp.*

---

sale or lease of property by one joint venturer to the joint venture itself, the agreement must be in writing. *Backus Plywood Corp. v. Commercial Decal, Inc.,* 317 F.2d 339, 342 (2d Cir.), *cert. denied,* 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963). Plaintiff argues that the transaction was between Forman, a joint venturer, and the alleged joint venture.

Defendants respond that the joint venture agreement was made in contemplation of acquisition of property from a third party, namely Sutcin, and as such was not subject to the stat-

ute of frauds. *See, e.g., Dayvault v. Baruch Oil Corp.,* 211 F.2d 335 (10th Cir.1954).

Resolution of this issue would depend upon the extent and characterization of Forman's interest in Sutcin.

As indicated above, however, the one year provision of the statute of frauds, N.Y.Gen. Oblig.Law § 5–701, clearly bars the alleged joint venture agreement. The alternative real property interest provision is, therefore, not determinative or material.

v. *ACME Quilting Co.*, 46 N.Y.2d 211, 219, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978)).

Applying the above standards to the present case, it is clear that the facts fall far short of establishing that the Lease should be reformed. Defendants cannot therefore rely on reformation of the Lease to avoid summary judgment in favor of the plaintiff's possession of the Theatres.

### B. Self Operation Proscription.

■ Cotter and Forman allegedly made statements to the effect that they would not, subsequent to the transactions with defendants, operate cinemas in New York. The defendants did not intend or believe, however, that any such statement by Cotter and Forman was to be included in the written Lease.[10] *See, e.g.,* Transcript of Deposition of Albert Schwartz ("Schwartz Dep."), at pp. 265–66, 372–73, 872. Defendants essentially admit this in their brief. Defendants' Mem. at p. 37. ("If it was ever contemplated that Forman and Cotter would retain the Theatres, a prohibition would have been included in the Lease.") There was, therefore, no "mistake" on the part of defendants, as would be required to reform the lease under either basis of reformation. *Chimart Associates v. Paul,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986). Defendants cannot rely on possession rights alleged to exist by virtue of reformation of the Lease through mutual mistake, or fraud and unilateral mistake.

Additionally, defendants could not show fraudulent concealment. There is absolutely no allegation, specific or otherwise, argued or alleged by defendants that would support concealment or misrepresentation on the part of the other parties to the Lease. Under the standards set out in *Chimart,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231, the Lease cannot be re-

formed, and the presumption that the Lease reflects the true intention of the parties cannot be disturbed.

Defendants' arguments essentially restate their joint venture contentions, namely that the Lease was part of a larger series of transactions. These arguments do not address the reformation of the Lease; at most they re-allege the existence of separate, contemporaneous oral agreements that would not create possessory interests in the Theatres.[11] In some cases parol evidence may be admissable to prove separate oral agreements, *e.g., Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 452 (2d Cir.1977), but that is irrelevant to defendants' reformation claim here, and irrelevant to rights to possession of the Theatres under the Lease.

### C. Lease Extension Provision.

Little discussion need be devoted to defendants' claim that the Lease must be reformed to extend the term for the period that the Murray Hill was closed. Again, defendants (and their counsel) did not believe or intend that the lease extension provision was to be included in the Lease. *See,* Schwartz Dep. at pp. 371–72, 561; Transcript of Deposition of Daniel Krause, Esq. ("Krouse Dep."), at pp. 46, 53–54. Conduct and statements made by the defendants after the collapse of the Murray Hill's ceiling indicate, in fact, that defendants believed that their agreements did *not* include an extension provision. For example, an amendment to the Cineplex Agreement states that Cineplex would provide booking services "if, as and when the Murray Hill Theatre opens for business during the term of the current lease." This is inconsistent with a position that the Lease was automatically extended by any

---

**10.** The very terms of the Lease indicate that it was contemplated that the landlord would be able to operate the Theatres itself after the Lease expired. The right of first refusal clause, § 22.01, extended for a twelve month period *after* the defendants vacated upon expiration. This provision clearly implies that the landlord would be able to operate the Theatres during that twelve month period.

**11.** The general rule is that equity will not specifically enforce a partnership or joint venture agreement where, as here, personal service obligations are involved. *See, e.g., Napoli v. Domnitch,* 18 A.D.2d 707, 236 N.Y.S.2d 549 (2d Dept. 1962), *aff'd without opinion,* 14 N.Y.2d 508, 248 N.Y.S.2d 228, 197 N.E.2d 623 (1964).

time that the Murray Hill was closed.[12] Any claim of "mistake" is precluded. *Chimart Associates v. Paul,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986).

■ A claim of fraudulent concealment is likewise insupportable on the present facts. Defendants rely only on a vague conversation between Cotter and Schwartz, and recalled by Schwartz, to the effect that Cotter acquiesced in a statement that the Lease was not as complete as it could have been. Schwartz Dep. at pp. 862–64. This falls far short of "substantial and convincing" evidence required to withstand summary judgment. *Backer Mgt. Corp. v. ACME Quilting Co.,* 46 N.Y.2d 211, 219–20, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978); *Chimart,* 66 N.Y.2d at 574, 498 N.Y.S.2d at 347, 489 N.E.2d at 234. *See also, Zion v. Kurtz,* 50 N.Y.2d 92, 105, 428 N.Y.S.2d 199, 405 N.E.2d 681 (1980).

As indicated by the above discussion, defendants' claims to possession based upon reformation of the Lease are insufficient as a matter of law.[13] The heightened burdens of proof defendants would be required to meet on a reformation claim underscore the propriety of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). The purported self operation proscription and lease extension provisions are not sufficient, as a matter of law, to preclude summary judgment for the plaintiff.

### 3. Right of First Refusal Provision.

■ As noted above, the Lease contained a right of first refusal provision. Lease §§ 22.01–04. Defendants argue that a breach of that provision would entitle them to possession of the Theatres, and that the provision was violated here. That provi-

sion was said to be broken by the sale transaction between Sutcin and SHA, and again through SHA's retention of CCC to book films for, and manage, the Theatres.

### A. Sale of the Theatres to SHA.

Defendants challenge the "genuineness" of the sale of the Theatres to SHA, and argue that material factual issues exist with regard to whether it was in substance a sale, or a lease. These contentions have little merit.

The difference between a lease and a sale is elementary: "upon the termination of [a lease] the real and personal property would revert to the lessor," whereas in a sale transaction the transferee, "upon the performance of its obligations [would] become, or have the option to become, the owner of the [transferred] property." *New York World–Telegram Corp. v. McGoldrick,* 298 N.Y. 11, 19, 80 N.E.2d 61, 64 (1948). Notwithstanding the peculiarities in the sale transaction alleged by defendants, there is no provision for reversion to Sutcin upon the expiration of a given period. Levin Aff. ¶ 17. It is not seriously contested that outright ownership of the Theatres will pass to SHA upon consummation of the obligations of the sale transaction.

In the Sutcin–SHA transaction, payment of principle, but not interest, was deferred for fifteen years. Contrary to defendants' apparent contention, there is nothing about a purchase of real property by way of a secured note, with deferred payment of principle, that transforms the transaction into a "lease." The provision for sale of only the Theatres, and not the underlying land, is also justified and consistent with a sale transaction.[14]

---

**12.** Defendants assert that Schwartz made handwritten notations in the margin of a preliminary draft of the Lease, relating to an extension provision in case of a shutdown. Schwartz Affidavit ¶ 81. This is not sufficient to create a factual issue of intent or mistake.

**13.** Again, the Court expresses no opinion as to possible liability for the activities discussed above. Only rights to *possession* of the Theatres are at issue here.

**14.** SHA has indicated various legitimate business and tax advantages it hoped would be gained through the particular structure of the transaction. Deferment of a sale of the actual land, for example, would have allowed Sutcin to postpone payment of gains taxes, and allowed SHA to avoid real estate transfer taxes. Similarly, ascertained interest payments would provide a steady stream of income, not subject to the uncertainties of return based on continued operation of the Theatres. *See,* Plaintiff's Memoran-

Defendants are correct in their assertion that it is well settled law in New York that the substance of an agreement, rather than its form, must control its interpretation. *Mann Theatres of California v. Mid Island Shopping Plaza Co.*, 94 A.D.2d 466, 464 N.Y.S.2d 793, 798–99, *aff'd*, 62 N.Y.2d 930, 479 N.Y.S.2d 213, 468 N.E.2d 51 (1984); *S & S Media Inc. v. Vango Media, Inc.*, 84 A.D.2d 356, 446 N.Y.S.2d 52, 54 (1st Dep't 1982). The Court determines that the substance of the Sutcin–SHA agreement was not a lease, and there is no basis here for defendants' claim to possession of the Theatres.

The genuineness of the sale does not need to be evaluated at trial to determine whether it is a "lease." All of the material evidence, including plenary transactional documents, *see, e.g.*, Exhibit 28, attached to Wolowitz Affidavit, and detailed testimony of principals and lawyers involved, *see, e.g.*, Transcript of Deposition of Michael R. Forman ("Forman Dep."), at pp. 62–66, 84–85; Transcript of Deposition of James J. Cotter ("Cotter Dep."), at pp. 61–62, 152–157, 201–03; and Levin Dep. at pp. 44–48, is before the Court. Defendants have not come forward with sufficient evidence to even raise a "metaphysical doubt" that the Sutcin–SHA transaction was really a forbidden lease. *Rosenthal v. Kingsley*, 674 F.Supp. at 1115, and there is no issue of fact relative to the first refusal clause, *cf.*, *Allright New York Parking v. Shumway*, 94 A.D. 2d 962, 463 N.Y.S.2d 968, 970 (4th Dep't 1983), which precludes summary judgment.

### B. The SHA–CCC Relationship.

■ Defendants alternatively claim that a breach of the right of first refusal provision has, or will, occur when SHA contracts with its subsidiary CCC to book films for the Theatres. Defendants argue that this

arrangement should be considered a "lease," and thus a violation of the refusal provision in their own Lease, which should entitle them to possession of the Theatres. This argument is not consistent with the realities of cinema management relationships, or the legal definition of a leasehold interest.

As noted, the factual basis of this argument arises from statements made by an officer of CCC, and reported in the press. That CCC officer was Ralph Donnelly. His testimony indicated that CCC would be "managing, buying and booking" for the Theatres. Transcript of Deposition of Ralph Donnelly ("Donnelly Dep."), at pp. 196–97.[15] The thrust of defendants' argument is apparently that the managing agreement between SHA and CCC constitutes a "lease." *See*, Schwartz Aff. ¶¶ 104–109.

A lease is significantly different from a managing agreement.[16] Under a management agreement, like a booking agreement, an agency relationship is created whereby the manager does not have a payment obligation, but rather receives from his principal a percentage of the gross income that is generated by the theatre, and is entitled to that percentage whether or not the principal makes a profit or loss on the theatre. A lessee, by contrast, has a payment obligation (*i.e.* rent), and also assumes the risk of loss in the operation of the theatre. *See*, Cotter Dep. at pp. 44–45, 86–87; Levin Aff. ¶¶ 6, n. 1, 25. Here, CCC will not incur a payment or rental obligation through the booking or management agreement, and SHA will retain the potential for profit, and the risk of loss. Levin Affidavit ¶ 25.

In sum, there is no reason to characterize the SHA–CCC agreement as a "lease," or to doubt that SHA will operate the Theatres itself, which it is entitled to do. *See*,

dum of Law in Support of Partial Summary Judgment ("Plaintiff's Mem."), pp. 15–17; Plaintiff's Reply Mem. pp. 19–23.

15. Donnelly's testimony did not, as defendants assert, indicate that CCC would "operate" the Theatres.

16. Defendants essentially acknowledge this distinction between a managing and booking

agreement on the one hand, and a lease on the other. With regard to the Cinema I & II; defendants entered into an "Agreement for Buying, Booking and Administration," and recognized that that agreement constituted a management agreement, but not a lease. *See*, Schwartz dep. pp. 156–57; Defendants' Mem. p. 28; Schwartz Aff. ¶ 27.

Part 2.B. above. There is no occasion to further evaluate that SHA–CCC relationship at trial; it could not conceivably provide defendants with a possessory right to the Theatres.

Finally, defendants repeat in various contexts broad, general requests for equitable relief in the form of a constructive trust, or an extension of the Lease. The Court only notes that specific performance or other equitable relief is not justified or appropriate here, and defendants have not in this regard shown reason why summary judgment should not be granted relative to possession of the Theatres. *See, Napoli v. Domnitch,* 18 A.D.2d 707, 236 N.Y.S.2d 549 (2d Dep't 1962), *aff'd without opinion,* 14 N.Y.2d 508, 248 N.Y.S.2d 228, 197 N.E. 2d 623 (1964); *Infusaid Corp. v. Intermedics Infusaid, Inc.,* 739 F.2d 661, 669 (1st Cir.1984).

## CONCLUSION

Partial summary judgement is granted for plaintiff as to all of those claims, counterclaims and defenses relating to possession of the Theatres. The various issues and counterclaims relating to liability and damages remain. Counsel for all parties are ordered to appear in Courtroom 36 on February 24 at 3:00 p.m. for a status conference.

SO ORDERED.